No. 23-2835

_____

United States Court of Appeals
*for the*
Eighth Circuit

_____

United States of America,

Plaintiff-Appellee,

vs.

Michael Hoeft,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the District of South Dakota - Southern Division
The Honorable Karen E. Schreier
_____

**APPELLANT'S BRIEF**

_____

BANGS, MCCULLEN, BUTLER,
FOYE & SIMMONS, LLP
Rick L. Ramstad
6340 S. Western Ave., Suite 160
Sioux Falls, SD 57108
T: 605-339-6800
rramstad@bangsmccullen.com
Attorney for Appellant

Appellate Case: 23-2835     Page: 1     Date Filed: 10/24/2023 Entry ID: 5329061

## Summary of the Case

Michael Hoeft was charged in a two-count Indictment with possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(9) and 924(a)(2). R. Doc. 1. Mr. Hoeft was convicted by jury of both counts of the Indictment. R. Doc. 127. He was sentenced on Count 1 to 168 months of imprisonment and on Count 2 to 120 months of imprisonment. Add. P. 1; R. Doc. 156. The terms were ordered to be served concurrently. *Id.*

Mr. Hoeft now appeals his convictions based upon the district court's denial of his motion to suppress (Add. p. 63; R. Doc. 53) and the district court's denial of his motion to dismiss Count 2 (Add. p. 8; R. Doc. 103). He also contends that the evidence was insufficient to convict him of possession with intent to distribute a controlled substance. Finally, he contends that the district court erred in denying his motion to admit statements made to a chemical dependency counselor for purposes of a chemical dependency evaluation pursuant to F.R.E. 803(4) and 807(b).

## Request for Oral Argument

Mr. Hoeft requests ten minutes of oral argument.

Appellate Case: 23-2835     Page: 2     Date Filed: 10/24/2023 Entry ID: 5329061

# Table of Contents

Page(s)

Summary of the Case ..................................................................... ii

Request for Oral Argument ........................................................... ii

Table of Authorities .................................................................... v

Jurisdictional Statement ............................................................. 1

Statement of the Issues ............................................................... 2

1.  Did the district court err in denying Mr. Hoeft's motion to suppress the evidence seized from his person at the time of his arrest?

2.  Did the district court err in denying Mr. Hoeft's motion to dismiss the indictment?

3.  Did the government fail to prove beyond a reasonable doubt that that Mr. Hoeft possessed methamphetamine with the intent to distribute?

4.  Did the district court err in denying Mr. Hoeft's motion to admit statements made to a chemical dependency counselor for purposes of a chemical dependency evaluation pursuant to F.R.E. 803(4) and 807(b)?

Statement of the Case ................................................................. 6

Summary of the Argument ......................................................... 6

Appellate Case: 23-2835     Page: 3     Date Filed: 10/24/2023 Entry ID: 5329061

Argument ................................................................ 8

Conclusion ............................................................. 47

Certificate of Service ............................................ 49

Certificate of Compliance .................................... 49

Addendum

Appellate Case: 23-2835    Page: 4    Date Filed: 10/24/2023 Entry ID: 5329061

# Table of Authorities

Page(s)

## United States Supreme Court Cases

*Brendlin v. California*, 551 U.S. 249 (2007) ............................... 2,11,13

*Crane v. Kentucky*, 476 U.S. 683, (1986) ............................................ 44

*Dist. of Columbia v. Heller*, 554 U.S. 570 (2008) ............... 2,17,19,21-23

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 .................. 18
(2022)

*Florida v. Bostick*, 501 U.S. 429 (1991) ..................................... 11,14,15

*McDonald v. City of Chi.*, 561 U.S. 742 (2010) .................................. 22

*Michigan v. Chesternut*, 486 U.S. 567 (1988) .................................... 11

*N.Y. State Rifle and Pistol Ass'n, Inc. v. Bruen*, ....................... 2,7,16-24
142 S.Ct. 2111 (2022)

*Taylor v. Illinois*, 484 U.S. 400 (1988) ............................................. 44

*Terry v. Ohio*, 392 U.S 1 (1968) ...................................................... 2-11

## Eighth Circuit Court of Appeal Cases

*United States v. Avalos*, 817 F.3d 597 (8th Cir. 2016) ......................... 32

*United States v. Balfany*, 965 F.2d 575 (8th Cir. 1992) ....................... 45

*United States v. Bell*, 761 F.3d 900, (8th Cir. 2014) ............................ 25

*United States v. Betcher*, 534 F.3d 820 (8th Cir. 2008) ....................... 15

Appellate Case: 23-2835    Page: 5    Date Filed: 10/24/2023 Entry ID: 5329061

Page(s)

*United States v. Boyd*, 180 F.3d 967 (8th Cir. 1999) ...........................26

*United States v. Bryson*, 110 F.3d 575 (8th Cir. 1997) ........................41

*United States v. Buford*, 108 F.3d 151 (8th Cir. 1997) ........................26

*United States v. Clay*, 883 F. 3d 1056 (8th Cir. 2018) .................... 3-44

*United States v. Colton*, 742 F.3d 345 (8th Cir. 2014) .........................25

*United States v. Haney*, 23 F.3d 1413 (8th Cir.), ...............................26
 cert. denied, 513 U.S. 898 (1994)

*United States v. Harris*, 747 F.3d 1013 (8th Cir. 2014) .......................14

*United States v. Hellems*, 866 F.3d 856 (8th Cir. 2017) .......................42

*United States v. Holmes*, 413 F.3d 770 (8th Cir. 2005) ........................44

*United States v. Iron Shell*, 633 F. 2d 77 (8th Cir 1980) .............3,45-46

*United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) .......................16

*United States v. Lopez*, 42 F.3d 463 (8th Cir. 1994) ............2,35-36,38-41

*United States v. Lopez*, 880 F. 3d 974 (8th Cir. 2018) .........................30

*United States v. McCracken*, 110 F.3d 535 (8th Cir. 1997) .................26

*United States v. Moore*, 212 F.3d 441 (8th Cir. 2000) ..................... 2,36

*United States v. Placensia*, 352 F.3d 1157 (8th Cir. 2003) .................32

*United States v. Provost*, 875 F.2d 172 (8th Cir.), .............................45
 cert. denied, 493 U.S. 859 (1989)

Appellate Case: 23-2835    Page: 6    Date Filed: 10/24/2023 Entry ID: 5329061

*United States v. Renville*, 779 F. 2d 430 (8th Cir. 1985) ..................... 45

*United States v. Santoyo-Torres*, 518 F.3d 620 (8th Cir. 2008) ........... 32

*United States v. Schubel*, 912 F.2d 952 (8th Cir. 1990) ........ 35-36,38-40

*United States v. Stephenson*, 924 F.2d 753 (8th Cir. 1991) ................ 8

*United States v. Thomas*, 58 F.3d 1318 (8th Cir. 1995) ...................... 26

*United States v. Turning Bear*, 357 F.3d 730 (8th Cir. 2004) ............. 44

*United States v. White*, 11 F.3d 1446 (8th Cir. 1993) ......................... 45

*United States v. Yellow*, 18 F. 3d 1438 (8th Cir 1994) ........................ 45

*United States v. Yielding*, 657 F.3d 688 (8th Cir. 2011) ..................... 15

## Other United States Court of Appeal Cases

*Folajtar v. Att'y Gen. of U.S., 980 F.3d 897* (3rd Cir. 2020) ............... 20

*Heller v. Dist. of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011) ............. 20

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ...................................... 20

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol,* ........................... 17
*Tobacco, Firearms & Explosives*, 700 F.3d 185
(5th Cir. 2012)

*United States v. Booker*, 644 F.3d 12 (1st Cir. 2011) .......................... 20

## Statutes

21 U.S.C. § 841(a)(1) .................................................................1,5,6,26

18 U.S.C. § 922(g)(1) ..................................................... 1,5,7,16,18-21

Appellate Case: 23-2835   Page: 7   Date Filed: 10/24/2023 Entry ID: 5329061

18 U.S.C. 922(g)(9) ................................................................ 1,5,21

18 U.S.C. 924(a)(2) ................................................................ 1,5,

18 U.S.C. §3231 ....................................................................... 1

28 U.S.C. §1291 ....................................................................... 1

F.R.E. 803(4) ...................................................................... 3,6,8,42-46

F.R.E. 807(b) ...................................................................... 3,6,8,42-43

## Other Authorities

C. Kevin Marshall, *Why Can't Martha Stewart* .................................. 20
*Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009)

Joseph G.S. Greenlee, *The Historical Justification* ............................ 23
 *for Prohibiting Dangerous Persons from Possessing*
 *Arms*, 20 Wyo. L. Rev. 249, 252 (2020)

Appellate Case: 23-2835    Page: 8    Date Filed: 10/24/2023 Entry ID: 5329061

# Jurisdictional Statement

## *The Decision Appealed*

Michael Hoeft appeals from the Judgment and Commitment filed against him on August 2, 2023 in the District Court of South Dakota, Southern Division. Add. P.1; R. Doc. 156. The Judgment and Commitment was imposed by the Honorable Karen E. Schreier, United States District Court Judge for the District of South Dakota, upon the jury's verdict of guilty at trial of Count 1, Possession with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. § 841(a)(1) and Count 2, Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(9), and 924(a)(2). R. Doc. 127

## *District Court's Jurisdiction*

The United States District Court for the District of South Dakota had jurisdiction in this prosecution pursuant to 18 U.S.C. §3231.

## *Appellate Court's Jurisdiction*

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1291.

## *Notice of Appeal*

Mr. Hoeft's Notice of Appeal was timely filed on August 11, 2023 R.

1

Doc. 157. His appeal was docketed in this Court on August 14, 2023, 2023.

## Statement of the Issues

1. Did the district court err in denying Mr. Hoeft's motion to suppress the evidence seized from his person at the time of his arrest?

*Apposite Cases*

*Terry v. Ohio*, 392 U.S 1 (1968)

*Brendlin v. California*, 551 U.S. 249 (2007)

2. Did the district court err in denying Mr. Hoeft's motion to dismiss the indictment?

*Apposite Cases*

*N.Y. State Rifle and Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111 (2022)

*Dist. of Columbia v. Heller*, 554 U.S. 570 (2008)

3. Did the government fail to prove beyond a reasonable doubt that that Mr. Hoeft possessed methamphetamine with the intent to distribute?

*Apposite Cases*

*United States v. Moore*, 212 F.3d 444 (8th Cir. 2000)

Appellate Case: 23-2835    Page: 10    Date Filed: 10/24/2023 Entry ID: 5329061

*United States v. Lopez*, 42 F.3d 463 (8th Cir. 1994)

4.    Did the district court err in denying Mr. Hoeft's motion to admit

       statements made to a chemical dependency counselor for purposes

       of a chemical dependency evaluation pursuant to F.R.E. 803(4)

       and 807(b)?

*Apposite Cases*

*United States v. Clay*, 883 F. 3d 1056 (8th Cir. 2018)

*United States v. Iron Shell*, 633 F. 2d 77 (8th Cir 1980)

## Statement of the Case

On September 24, 2021 at approximately 9:35 a.m., a 911 call was

received by Metro Communication Sioux Falls from the manager of a

storage facility reporting a man sleeping in a vehicle parked within the

facility. R. Doc. 40, Hr'g. Tr. at pp. 7-8. Sioux Falls police officers were

dispatched to the storage facility for a "man down," or a well-being

check. *Id. at* p. 7.

Upon arriving at the storage facility, officers observed a white Ford

Ranger pickup parked in a lane between two rows of storage garages.

Arriving in two separate vehicles, the officers positioned one of their

vehicles at one end of the lane and another at the other end on the lane,

Appellate Case: 23-2835     Page: 11     Date Filed: 10/24/2023 Entry ID: 5329061

in a manner which would prevent the pickup from leaving the facility. *Id.* at p 31. Three uniformed officers then got out of the two police vehicles and approached Mr. Hoeft's vehicle. *Id.* at p. 12.

One of the officers testified that as she was reaching through the open driver's side window to turn the ignition key off, Mr. Hoeft awoke. *Id.* at p. 16; Gov. Hr'g. Ex. 2 at 01:45-01:49. The subsequent conversation between officers and Mr. Hoeft was recorded by the officers' body cameras. *See, e.*g., R. Doc. 32, Gov. Hr'g. Ex. 2 at 01:50-2:30.

Perceiving that Mr. Hoeft was not willing to comply with an officer's order to exit the vehicle, an officer positioned on the passenger side of the pickup, broke the vehicle's window with a baton. A taser and pepper spray were deployed to subdue Mr. Hoeft as he was pulled from the vehicle and placed in handcuffs. R. Doc. 40, Hr'g. Tr. at p. 65; Gov. Hr'g. Ex. 3 (file 1) at 02:55-03:13; Hr'g. Ex. 2 at 03:38.

As they were pulling Mr. Hoeft from the vehicle, officers observed a .22 caliber handgun holstered on his belt. A subsequent search of his person revealed two syringes and two baggies containing 0.03 grams and 1.56 grams in his front pants pocket. *Id.* at pp. 18-19, 58. A later

4

search of his jacket revealed two additional baggies containing 40.7 grams 28.0 grams, respectively. R. Doc. 151, at ¶¶ 13,18 and 19. Two more syringes were also found in the pocket of the jacket. R. Doc. 130, at Ex. 16 and 42.

On December 7, 2021, a two-count indictment was filed in the United States District Court for the District of South Dakota, charging Mr. Hoeft in Count 1 with Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. § 841(a)(1) and in Count 2 of Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(9), and 924(a)(2). Mr. Hoeft entered not guilty pleas on both counts.

On March 8, 2022, Mr. Hoeft filed a motion to suppress the evidence seized incident to the arrest, arguing that law enforcement's actions in confronting him while asleep in his vehicle at the storage facility was a seizure within the meaning of the Fourth Amendment. R. Doc 22-23. A hearing was held on the motion on March 22, 2022. R. Doc 26. On July 1, 2023, the district court entered an order denying the motion to suppress and adopting the report and recommendations of the magistrate. Add. p. 8; R. Doc. 53.

Appellate Case: 23-2835    Page: 13    Date Filed: 10/24/2023 Entry ID: 5329061

A jury trial commenced on March 28, 2023, before the Honorable Karen E. Schreier, District Judge. The jury returned a verdict of "guilty" as to both Counts 1 and 2 of the Indictment. R. Doc. 127. Mr. Hoeft was sentenced on July 21, 2023 on Count 1 to 168 months of imprisonment and on Count 2 to 120 months of imprisonment. All terms were ordered to be served concurrently. Add p. 1; R. Doc. 155.

Mr. Hoeft now appeals raising three arguments.

First, Mr. Hoeft argues that the district court erred in denying his motion to suppress the evidence seized from his person. Second, he argues that the district court erred in denying his motion to dismiss Count 2 of the Indictment. Third, he argues that the Government failed to prove beyond a reasonable doubt that he intended to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1).

Finally, Mr. Hoeft argues that the district court erred in denying his motion to admit statements made to a chemical dependency counselor for purposes of a chemical dependency evaluation pursuant to F.R.E. 803(4) and 807(b)

## Summary of the Argument

In his first issue Mr. Hoeft argues that that the district court erred

6

in denying his motion to suppress the evidence seized from his person at the storage facility following his arrest. Specifically, he asserts that he was seized when the three officers who responded to the 911 call parked their vehicles in a manner that prevented him from leaving the lane between the storage garages area where he was parked and approached his vehicle on foot.

In his second issue Mr. Hoeft argues that the district court should have dismissed the Count 2 of the Indictment charging violations of 18 U.S.C. § 922(g)(1) and (9) as inconsistent with the Nation's historical tradition of firearm regulation and facially unconstitutional under the United States Supreme Court's ruling in *N.Y. State Rifle and Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

In his third issue Mr. Hoeft argues that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he possessed the methamphetamine found on his person with the intent to distribute. Specifically, he asserts that the circumstantial evidence presented by the government, considering the evidence of his substantial daily methamphetamine consumption, was insufficient to sustain his conviction when viewed in a light most favorable to the

7

verdict.

In his fourth issue Mr. Hoeft argues that The district court erred in denying his motion pursuant to F.R.E. 803(4) and 807(b),to admit statements he made to a chemical dependency counselor for purposes of a chemical dependency evaluation as affecting his substantial right to present a complete defense and having more than a slight influence on the verdict.

## Argument

**1. The district court erred in denying Mr. Hoeft's motion to suppress the evidence seized from his person at the time of his arrest.**

*Standard of Review*

A mixed standard of review applies to the denial of a motion to suppress evidence. "We review the district court's findings of fact under the clearly erroneous standard, and the ultimate conclusion of whether the Fourth Amendment was violated is subject to de novo review." *United States v. Stephenson*, 924 F.2d 753, 758 (8th Cir. 1991).

*Argument*

Mr. Hoeft contends that the district court erred in denying his motion to suppress the evidence seized from his person at the storage

8

facility following his arrest. Add. p. 63; R. Doc. 53. Specifically, he asserts that he was seized when the three officers who responded to the 911 call parked their vehicles in a manner that prevented him from leaving the lane between the storage garages area where he was parked. R. Doc. 40, Hr'g. Tr. at p. 12.

On September 24, 2021 at approximately 9:35 a.m. a 911 call was received by Metro Communications in Sioux Falls, South Dakota from the manager of a storage facility reporting a man sleeping in a vehicle parked within the facility. *Id.* at pp. 7-8. Sioux Falls police officers were dispatched to the storage facility for a "man down," or a well-being check. *Id.* at p. 7. Following their arrival and entrance into the facility the officers observed a man "sleeping or unconscious in white Ford Ranger pickup. *Id.* at pp. 13, 14.

Officers testified that they observed a crossbow nocked with a broadhead bolt on the passenger's seat of the vehicle, (Hr'g. Tr. at pp. 14, 17, 54) a knife and several more crossbow bolts in the headliner above the driver's seat. *Id*. One of the officers testified that as she was reaching through the open driver's side window to turn the ignition key off, the man awoke. *Id.* at p. 16; Gov. Hr'g. Ex. 2 at 01:45-01:49. The

9

subsequent conversation between officers and Mr. Hoeft were recorded by the officers' body cameras. *See, e.*g., R. Doc. 32, Gov. Hr'g. Ex. 2 at 01:50-2:30 and are described more fully in the Magistrate's Report and Recommendation. R. Doc. 43.

When ordered to exit the vehicle by one of the officers, Mr. Hoeft stated, "Let me guess . . . "The officer repeated the order and the Mr. Hoeft again replied, "Let me guess . . . ," At that point, officers grabbed Mr. Hoeft's wrist and arm tried to pull him from the truck. R. Doc. 32, Gov. Hr'g. Ex. 2 at 02:30; Hr'g. Tr. at p. 17. The ensuing struggle was also recorded by the officers' body cameras and more fully described in the Magistrate's Report and Recommendation. R. Doc. 43.

After breaking the passenger window with a baton, officers deployed a taser and pepper spray and Mr. Hoeft was pulled from the pickup. R. Doc. 32, Hr'g. Tr. at p. 65; Gov. Hr'g. Ex. 3 (file 1) at 02:55-03:13; Hr'g. Ex. 2 at 03:38. Officers testified that a handgun, two hypodermic needles were discovered following a search of the Mr. Hoeft's person and clothing. *Id.* at pp. 18-19, 58.

A Fourth Amendment seizure occurs when a police officer "has in some way restrained the liberty of a citizen" through "physical force or

Appellate Case: 23-2835     Page: 18     Date Filed: 10/24/2023 Entry ID: 5329061

show of authority." *Terry v. Ohio*, 392 U.S 1, 19 n. 16 (1968). To determine if law enforcement's actions constitute a seizure, courts should ask whether "a reasonable person would feel free to . . . terminate the encounter." *Brendlin v. California*, 551 U.S. 249, 255 (2007). The principal question is "whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chestnut*, 486 U.S. 567, 569 (1988)).

The district court reasoned that "the officers' approach to the truck did not amount to a show of force [because they] . . . approached the truck with their weapons holstered without issuing commands, shining flashlights, or activating their sirens or lights. R. Doc. 53, p. 6). The district court reasoned that because Mr. Hoeft was "unconscious[]" at the time officers reached his vehicle, their conduct did not rise to the level of a Fourth Amendment seizure. The district court adopted the finding of the magistrate that Hoeft was not "seized until the officers ordered him out of his truck and opened the driver's door to remove

11

him." *Id.* at pp. 7-8 (holding that "[u]p until that time, the encounter was consensual.

To reach this conclusion, the court had to ignore the plain meaning of "consensual" as in an unconscious state. Prior to awakening, Mr. Hoeft had no ability to consent. Upon awakening, however, Mr. Hoeft was quite conscious as he engaged in a colloquy with the officer standing beside the door of his vehicle:

> Officer McGillivray asked, "How are you?"
>
> "I'd say better than average; how about you?" asked Mr. Hoeft.
>
> "I'm excellent," she replied. "It's Friday today—for me." "Sweet." Mr. Hoeft leaned his left arm on the driver's door and covered his mouth with his palm.
>
> Officer McGillivray asked, "What are you doing?"
>
> "I stopped here to take some crap out of the back," he said, gesturing toward the truck bed.

R. Doc. 43, Mag. Rpt., pp. 5-6).

Awaking to an officer reaching into his vehicle and two other officers flanking the vehicle, the trial court's determination that Mr. Hoeft was not seized prior to the officer's command to exit his vehicle was clearly erroneous. This point was illustrated by Officer Miller at the

Appellate Case: 23-2835     Page: 20     Date Filed: 10/24/2023 Entry ID: 5329061

suppression hearing:

> Q. And so if he had gotten out of his vehicle when you first parked your vehicles, would you have let him leave?

> A. No.

> Q. And so he was not free to leave when you first parked your vehicles?

> A. Correct.  He was not free to leave, but he was not under arrest when we parked our vehicles.  He was going to be detained.

R. Doc. 40, Hr'g. Tr. at 70:3.

The district court's finding that "[a]lthough Hoeft's ability to move his truck may have been hindered . . . a reasonable person in Hoeft's position would have felt free to terminate the encounter and go about his business," defies the reality of the situation that the officer's present acknowledged as well as the law. In *Brendlin*, the Supreme Court addressed the situation here:

> When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not.

*Brendlin*, 551 U.S. at 2405. The Court stated, "when a person 'has no desire to leave' for reasons unrelated to the police presence, the 'coercive

effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter[.]" *Id.* at 2405-2406 (quoting *Florida v. Bostick*, 501 U.S. 429, 435-436 (1991). Here, the district court's finding that Mr. Hoeft's position left him free to go about his business cannot be squared with the fact that his attempt to do just that, subjected him to pepper spray and electrocution by taser.

The officers testified that they were dispatched to the storage area for a "man down" well-being check. (Hr'g. Tr., R. Doc 40, 7:10, 51:17). But whatever lawful purpose the officers had in investigating Mr. Hoeft's presence at the storage facility never reached fruition. This Court has recognized that when an officer acts under the community caretaker doctrine, "[t]he police must allow the person to proceed once the officer has completed the officer's inquiry, unless, of course, the officer obtains further reason to justify the stop." *United States v. Harris*, 747 F.3d 1013, 1017 (8th Cir. 2014).

Mr. Hoeft advised the officers that he was doing "better than average," yet the district court adopted the magistrate's conclusion that Mr. Hoeft's seizure was justified "to determine if he needed assistance

14

due to a medical event or was impaired such that allowing him to remain in control of the truck would create a danger to the public." Mr. Hoeft submits that this conclusion has no basis in the hearing record as no evidence was offered that would suggest that he was suffering any sort of medical event or was otherwise impaired.

In the case, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436. The facts here demonstrate that was not the case. Mr. Hoeft's efforts to terminate the encounter were flatly rejected by the responding officers. For these reasons, Mr. Hoeft asserts that the district court erred in denying his motion to suppress the evidence seized from his person.

## 2. The district court erred in denying Mr. Hoeft's motion to dismiss the indictment.

*Standard of Review*

Challenges to the constitutionality of a federal statute are reviewed de novo. *United States v. Betcher*, 534 F.3d 820, 823 (8th Cir. 2008). The denial of a motion to dismiss an indictment is also reviewed de novo. *United States v. Yielding*, 657 F.3d 688, 702 (8th Cir. 2011).

*Argument*

15

The district court should have dismissed the Count 2 of the Indictment charging violations of 18 U.S.C. § 922(g)(1) and (9) as inconsistent with the Nation's historical tradition of firearm regulation and facially unconstitutional under the United States Supreme Court's ruling in *N.Y. State Rifle and Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

Section § 922(g) provides in pertinent part:

> (g) It shall be unlawful for any person-
>
>> (1)    who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; or . . .
>>
>> (9)    who has been convicted in any court of a misdemeanor crime of domestic violence,
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

Notwithstanding this Court's decision in *United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023), the Supreme Court's holding in *N.Y. State Rifle & Pistol Ass'n v. Bruen,* makes clear that § 922(g)(1) and (9) are facially unconstitutional unless the Government can establish that

16

prohibiting the possession of firearms by all felons or certain

misdemeanants is part of the historical tradition of the right to keep

and bear arms. *Bruen*, 142 S. Ct. at 2129–30.

The Second Amendment protects "the right of the people to keep and

bear Arms." U.S. Const. amend. II. The Amendment "guarantee[s] the

individual right to possess and carry weapons in case of confrontation."

*Dist. of Columbia v. Heller*, 554 U.S. 570, 592 (2008).

The Supreme Court's decision in *Bruen* set out "the standard for

applying the Second Amendment" as follows:

> When the Second Amendment's plain text covers an
> individual's conduct, the Constitution presumptively
> protects that conduct. The government must then justify its
> regulation by demonstrating that it is consistent with the
> Nation's historical tradition of firearm regulation. Only then
> may a court conclude that the individual's conduct falls
> outside the Second Amendment's "unqualified command."

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2129–30

(2022). In so holding, the Supreme Court rejected lower courts' use of

means-end scrutiny in Second Amendment cases. *See Id*. at 2125–27 &

n.4 (abrogating *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol,*

*Tobacco, Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012)). "Instead,

the government must affirmatively prove that its firearms regulation is

Appellate Case: 23-2835    Page: 25    Date Filed: 10/24/2023 Entry ID: 5329061

part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

*Bruen* also teaches that, "when it comes to interpreting the Constitution, not all history is created equal." *Bruen*, 142 S.Ct. at 2136. Courts must "guard against giving postenactment history more weight than it can rightly bear." *Id.* Historical evidence from the late nineteenth century and the twentieth century "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 & n.28; *see also*, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2267 (2022) (stating that "how the States regulated" when a constitutional Amendment was ratified is "the most important historical fact").

The Second Amendment's plain text covers the conduct proscribed by Sections 922(g)(1) and (9), and the prosecution did not meet its burden of establishing that this application of Section 922(g)(1) or (9) are consistent with the Nation's historical tradition of firearm regulation.

Applying *Bruen's* standard, the Second Amendment's plain text covers the "possess[ion]" of a firearm that Sections 922(g)(1) and (9) criminalize. 18 U.S.C. § 922(g)(1). The term "'[k]eep arms' was simply a

common way of referring to possessing arms." *Heller,* 554 U.S. at 583.

Mr. Hoeft is one of "the people" under the Second Amendment's plain text. *See, Heller*, 554 U.S. at 581 (noting that Second Amendment right "belongs to all Americans"); *Id.* at 580 (quoting prior decision describing "the people" as the "class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community"); *see also, e.g.*, U.S. Const. amend. I (using "the people" in Assembly-and-Petition Clause); U.S. Const. amend. IV (using "the people" in Search-and-Seizure Clause). *Bruen* reiterates that the Second Amendment guarantees to "all Americans" the right to keep and bear arms. 142 S. Ct. at 2156 (quoting Heller, 554 U.S. at 581). Because the Second Amendment's plain text covers the individual possession of firearms, the Second Amendment "presumptively protects" that conduct. *Bruen*, 142 S. Ct. at 2129–30.

Courts have recognized that "the federal felony firearm possession ban, 18 U.S.C. § 922(g)(1), 'bears little resemblance to laws in effect at the time the Second Amendment was ratified,' as it was not enacted until 1938, was not expanded to cover non-violent felonies until 1961,

19

and was not re-focused from receipt to possession until 1968." *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 196, abrogated by *Bruen*, 142 S. Ct. 2111 (quoting *United States v. Booker*, 644 F.3d 12, 23–24 (1st Cir. 2011)).

Then-Judge Barrett and other jurists have likewise concluded that "Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting); *see, e.g., Id.* at 453–64 (surveying history); *Heller v. Dist. of Columbia,* 670 F.3d 1244, 1253 (D.C. Cir. 2011) ("[S]tates did not start to enact [felony-based prohibitions on possession] until the early 20th century."); *Folajtar v. Att'y Gen. of U.S., 980 F.3d 897*, 914 (3rd Cir. 2020) (Bibas, J., dissenting).

Scholars have likewise concluded that "no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms." *See, e.g.*, C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009) (observing that such prohibitions have their origins in the twentieth century).

To uphold the application of § 922(g)(1) or (9), *Bruen* requires the prosecution to establish a historical "tradition"—a robust record of

20

regulations demonstrating an accepted and enduring restriction on the Second Amendment right. *See, e.g., Id*. at 2156 (demanding a "broad tradition," not "outlier" regulations). It cannot and did not because both §§ 922(g)(1) and (9) "address[] general societal problem[s] that ha[ve] persisted since the 18th century," *Bruen* instructs that "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131. So too "if earlier generations addressed the societal problem, but did so through materially different means." *Id*. The inquiry may also turn upon "how" and "why" historical regulations burdened the Second Amendment right. *Id*. at 2132–33.

In denying Mr. Hoeft's motion to dismiss, the district court noted:

> The same reasoning that upholds the constitutionality of 18 U.S.C. § 922(g)(1) also applies to § 922(g)(9). Those convicted of domestic violence are not the "law-abiding citizens" that *Bruen* meant to protect, and the Supreme Court has consistently recognized and applied the prohibitions on possession of firearms by those convicted of domestic violence offenses in the aftermath of *Heller*.

*Bruen's* holding prevails over *Heller's* dictum. The Supreme Court in *Heller* did "not undertake an exhaustive historical analysis" when it

21

stated—in dictum, and without citation—that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which the Court described in a footnote as "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n.26; *see McDonald v. City of Chi.*, 561 U.S. 742, 786 (2010) (plurality) (same); *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (quoting same).

Without attempting to bolster *Heller's* reasoning, *Bruen* instead holds that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. at 2126. "Only if" the government meets its burden, the Court holds, may a court uphold a regulation as constitutional. *Id.* *Bruen's* holding must prevail over *Heller's* footnote-consigned dictum. *See Heller*, 554 U.S. at 625 n.25 ("It is inconceivable that we would rest our interpretation of the basic meaning of any guarantee of the Bill of Rights upon such a footnoted dictum in a case where the point was not at issue and was not argued.").

*Heller* itself indicates that its dicta should not control here. Dissenting in *Heller*, Justice Breyer criticized the reference to

Appellate Case: 23-2835    Page: 30    Date Filed: 10/24/2023 Entry ID: 5329061

longstanding felon-disarmament laws as "ipse dixit," noting that the majority "fail[ed] to cite any colonial analogues" to such statutes. 554 U.S. at 721-22. The majority responded that there would "be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Id.* at 635.

This rejoinder suggests the *Heller* Court assumed "felons can be deprived of the [Second Amendment] right if that deprivation is consistent with history and tradition." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 252 (2020). The Court's allusion to "expound[ing] upon the historical justifications" for felon-disarmament laws would make no sense if the Court believed felons could be disarmed regardless of whether history supported that exclusion.

The Court in *Heller* did not limit the Second Amendment right to law-abiding, responsible citizens. Rather, it said that, at the very least, such people are protected by the Second Amendment. By beginning the quoted passage with "whatever else it leaves to future evaluation," the

Court made clear that its reference to "law-abiding, responsible citizens" was meant to establish a Second Amendment floor, not a ceiling. The Court, in other words, held that law-abiding, responsible citizens have a right to possess firearms, but it did rule out the conclusion that people such as Mr. Hoeft have that right as well.

If *Bruen* excluded the non-law-abiding from the Second Amendment, the opinion would suffer from hopeless internal inconsistency. *Bruen's* central premise is that history is paramount in Second Amendment interpretation. Yet the historical record provides no support whatsoever for felon-disarmament laws, much less those applicable to misdemeanants. The trial court's holding is based solely on the implication that non-law-abiding citizens cannot possess firearms is— uniquely among all issues of Second Amendment interpretation— exempt from the requirement that the amendment's scope be firmly rooted in history. *Bruen* does not permit such a result.

### 3. The government failed to prove beyond a reasonable doubt that that Mr. Hoeft possessed methamphetamine with the intent to distribute.

*Standard of Review*

The Court reviews "de novo" the sufficiency of the evidence to

24

sustain a conviction, viewing the evidence in a light most favorable to the verdict and accepting all reasonable inferences supporting the verdict." *United States v. Bell*, 761 F.3d 900, 906-907 (8th Cir. 2014). Furthermore, this Court will overturn a conviction "only if no reasonable jury could have found him guilty beyond a reasonable doubt." *United States v. Colton*, 742 F.3d 345, 348 (8th Cir. 2014) (*per curiam*). The standard of review for sufficiency of the evidence challenges is strict. *Id*. at 348.

*Argument*

The whole of the methamphetamine which forms the basis of Mr. Hoeft's conviction was all found on his person at the time of his arrest. At trial, arresting law enforcement officers testified regarding the items seized from Hoeft's person: two bags from the pocket of his jacket, one containing 28.0 grams of methamphetamine and the other containing 41.242 grams of methamphetamine R. Doc. 151, PSR at ¶¶ 18-19); two bags containing methamphetamine from the pocket of his jeans, with one bag weighing 0.03 grams and the other bag weighing 1.56 grams R. Doc. 151, PSR at ¶ 13); a .22 caliber handgun and a clip containing ammunition (Ex. 40 and 41); a digital scale, also found in his jacket

25

pocket (Ex 29); and a total four syringes with hypodermic needles attached, with two being found in his pants pocket and two being found in his jacket pocket. (Ex. 16 and 42).

Because Mr. Hoeft admitted that he knowingly possessed the methamphetamine found on his person, at the close of the evidence the government only had to prove the issue of distribution and the quantity, if any, of the methamphetamine attributable to Mr. Hoeft for the purposes of the applicable mandatory minimum sentence. *See, United States v. McCracken*, 110 F.3d 535, 541 (8th Cir. 1997) (stating that to convict a defendant on a violation of 21 U.S.C. § 841(a)(1), "the government had to prove that he knowingly possessed the methamphetamine with the intent to distribute") (citations omitted); *United States v. Thomas*, 58 F.3d 1318, 1322 (8th Cir. 1995) (articulating essential elements government must prove to establish a violation of 21 U.S.C. § 841(a)(1)). Intent to distribute controlled substances may be proved by either direct or circumstantial evidence. *United States v. Boyd*, 180 F.3d 967, 980 (8th Cir. 1999); *see also United States v. Buford*, 108 F.3d 151, 154 (8th Cir. 1997); *United States v. Haney*, 23 F.3d 1413, 1417 (8th Cir.), cert. denied, 513 U.S. 898 (1994).

Appellate Case: 23-2835   Page: 34   Date Filed: 10/24/2023 Entry ID: 5329061

The district also instructed the jury regarding the necessity of determination the quantity of methamphetamine intended for distribution: "You must determine the total quantity of the controlled substance involved in the offense that was possessed by the defendant with the intent to distribute." R. Doc 124, Instruction No. 2.

As noted above, Mr. Hoeft did not contest that he knowingly possessed more than 50 grams of actual methamphetamine. Rather, he testified that the whole of the methamphetamine found on his person was for his exclusive use. Thus, he challenges the sufficiency of the evidence with respect to his conviction for possession with intent to distribute 50 grams or more of actual methamphetamine.

At trial, the government relied heavily on the testimony of Special Agent Brandon Purcell of the Drug Enforcement Administration ("DEA"). Special Agent Purcell testified that, based on his education, training and experience, the quantity of the methamphetamine discovered on Mr. Hoeft's person, the presence of a firearm and ammunition and a scale near the drugs, was consistent with the distribution of methamphetamine. R. Doc. 163 T.Tr., Vol. 2 at 308:17.

In his defense, Hoeft testified that he had a longstanding addiction to

methamphetamine and that the methamphetamine recovered from his person was for his personal use. Mr. Hoeft testified that he had first used methamphetamine in 1987 and most recently, had been on a binge since 2013. R. Doc. 163, T.Tr., Vol. 2 at 363:1.

Mr. Hoeft testified that his preferred method of use was via intravenous injection but would also orally ingest it or smoke it. *Id.* at 363:12. Most typically, he would "backload a rig" by crushing the methamphetamine to a fine powder and placing it in the syringe. *Id.* at 365:1. Then, he would place the needle of the syringe into a vein and draw his blood into the syringe to liquify the substance. *Id.* at 365:3.

Using this method, Mr. Hoeft was able to use up to a gram of methamphetamine at a time. *Id.* Referring to this method as a "concrete mixer", he explained that due to his high tolerance to methamphetamine after years of binge use, he sometimes used more than a gram of methamphetamine per dose to maintain a "high" and use continuously throughout the day to maintain that state. *Id.*

Mr. Hoeft, testified:

> You can use a bigger syringe; But, I mean, a gram is --a gram to the gram and a quarter is kind of the outer limits for me. Like, I can use that one time. And then if I hit one again, Like in three hours . . . Because if you do too much, you'll

Appellate Case: 23-2835    Page: 36    Date Filed: 10/24/2023 Entry ID: 5329061

> over amp or – you'll over amp. like, your body. Like, you'll
> just kind of shut down, you know, and fall out; or, I mean, all
> kinds of bad things can happen.

*Id.* at 366:3.

Mr. Hoeft testified that during a binge he could use more than seven

grams of methamphetamine per day. *Id.* at 368:19. His typical use

varied between four and seven grams per day. *Id.* at 371:1. He

explained:

> It depends on how long the binge is for. You know. I mean,
> because it varies from binge to binge, from time to time, from
> use to use, from binge to binge. It varies. Like, you can't always
> go, like, Five days. You can't always go seven days. Sometimes
> it's three days, have a nap. You know what I mean? Like, it's
> not --I wish I could say there was, like, a formula to it, you
> know, or like a method to it, but there just isn't.

*Id.* at 371:6.

The government did not dispute Hoeft's contention that he was a

methamphetamine addict. Rather, it questioned Mr. Hoeft's credibility

concerning his assertions as to the daily quantity of methamphetamine

he consumed; and that the whole of the quantity of methamphetamine

in his possession was for his personal use.

In its case-in-chief, the government offered the testimony of DEA

Special Agent Brandon Purcell. Agent Purcell testified that a typical

methamphetamine addict would use approximately one gram per day. R. Doc 163, T.Tr., Vol. 2 at 237:19. On cross examination Agent Purcell testified that a heavy user might use "an 8-ball a day." *Id.* at 327:23. An "8-ball" is 1/8 of an ounce, or 3.5 grams. *Id.* at 330:11. Upon further questioning, Agent Purcell conceded that the National Highway Traffic Safety Administration had published a report recognizing that a binge methamphetamine user could consume up to 5,000 milligrams of methamphetamine per day (five grams). However, Agent Purcell insisted that this finding was not consistent with his training and experience. *Id.* at 329:8.

In *United States v. Lopez*, 880 F. 3d 974 (8th Cir. 2018), the issue at trial was also whether the drugs the defendant carried on her person were intended for distribution or for personal use. *Id.* at 978. In *Lopez*, the defense expert testified that a binge user using up to seven and a half grams of drugs per day was not unheard of. *Id.*

Likewise, in this case, Agent Purcell's discussion of personal use quantities of methamphetamine, and in particular his statement that a heavy user might use an 8-ball a day at most was also admitted under the guise of expert testimony. Like the agent in *Lopez,* Agent Purcell

30

testified that he had substantial law enforcement training and experience, was trained generally in the investigation of violations of the Controlled Substances Act and had specific training on narcotics investigations and related and investigative techniques. R. Doc 163, T.Tr., Vol. 2 at 285:20.

Notably, Agent Purcell did not testify that his knowledge of typical personal use quantities was the result of specialized training or personal experience. Rather, Agent Purcell clearly indicated that his knowledge of typical personal use drug quantities was based upon information garnered from interviews with those he investigates and associated persons:

> One of our best assets that we have at our disposal would be the use of a wiretap. And like the AUSA is saying, that is real-time information. It is organic. You can take out the human element of maybe someone lying to me about maybe their statements they make in an interview. The wiretap is usually – you're hearing these people unknowingly. They're talking, just freely, to their coconspirators. And you hear exactly, without any law-enforcement interference, these aspects of their lives.

*Id.* at 296-297.

In the context of "coded drug phrases," this Court has previously held that, before a purported expert may opine on a particular topic, it must

31

be shown that the expert's opinion is based on "personal experience and training and not merely upon the hearsay testimony of non-witness drug dealers." *United States v. Avalos*, 817 F.3d 597, 601 (8th Cir. 2016) (quoting *United States v. Placensia*, 352 F.3d 1157, 1165 (8th Cir. 2003)). In *Placensia*, for example, this Court found that task force agents' testimony about drug jargon was based on more than mere hearsay because "[b]oth agents testified concerning their experience as narcotics investigators and testified they each had purchased methamphetamine as undercover officers." *Placensia*, 352 F.3d at 1165.

Here, by contrast, Agent Purcell expressly indicated that his knowledge of personal use quantities came from the hearsay testimony of non-witnesses. R. Doc. 163, T.Tr., Vol. 2 at 295:14. The government did not adduce any evidence at trial supporting a conclusion that "experts in the [drug trafficking] field would reasonably rely on [hearsay information] in forming an opinion on the subject" of personal use quantities. *See* Fed. R. Evid. 703; *but see United States v. Smith*, 789 F.3d 923, 930–31 (8th Cir. 2015) (noting that the Court has "repeatedly upheld the admission" of expert testimony on topics such as drug packaging and personal use and distribution quantities); *United*

*States v. Santoyo-Torres*, 518 F.3d 620, 623 (8th Cir. 2008) (approving testimony about personal use by "[g]overnment witnesses with extensive experience in methamphetamine cases").

Assuming, however, that law enforcement experts would rely on hearsay evidence to develop opinions about typical personal use quantities, Agent Purcell's testimony lacked any indicia of credibility when considered against the National Highway Traffic Safety Administration's recognition that a binge user might use up to 5 grams a day. R. Doc 163, T.Tr., Vol. 2 at 328:11.

The record here establishes that Agent Purcell's opinion about personal use quantities was the result of hearsay information provided to him by individuals he interviewed and/or arrested and their associates. Even if it was appropriate for Agent Purcell to rely on such hearsay to form an opinion on the topic (Rule 703 permits him to disclose the hearsay underlying his opinion to the jury "only if the[] probative value in helping the jury evaluate the opinion substantially outweighs the prejudicial effect") The source of his "8-ball" testimony was completely contradicted by the National Highway Traffic Administration study.

33

Aside from arguing that the quantity of methamphetamine found on Mr. Hoeft's person was more than that of a typical user, the government also argued that the loaded firearm and digital scale necessarily established that Hoeft possessed the methamphetamine with the intent to distribute. Yet the firearm in question was a .22 caliber pistol, loaded with bird shot ammunition. The government's firearms expert testified, that .22 caliber bird shot is "designed and intended to kill rodents or hurt a squirrel or nuisance game or maybe kill a small bird. R. Doc. 163, T.Tr., Vol. 2 at 232:10.

Agent Purcell testified regarding Mr. Hoeft's purported use for this handgun based upon recorded jail phone calls following Mr. Hoeft's arrest. "I do believe that in the jail call, if I remember correctly, the defendant states that he has a pistol with rat shot because he's living in his vehicle and uses the pistol to hunt for food." *Id.* at 318:6.

The government also evidence up position of a scale as evidence of intent to distribute. However, agent Purcell admitted that the fact that a person's possession of methamphetamine together with a scale is not dispositive of the question of intent to distribute.

A. So, my statement about the scale is that the scale can be used for both of those purposes. As the purchaser, I could

Appellate Case: 23-2835    Page: 42    Date Filed: 10/24/2023 Entry ID: 5329061

use it to make sure that what I'm getting is what I paid for. And as the distributor, I can make sure to pass that same ethic down the line. I'm going to make sure I'm giving what the person I'm selling it to is paying for.

Q.    And that rule goes right down to the lowest level user who wants to get what they're paying for. These digital scales, they're - you don't have to buy them out of a science lab. They have them on the shelf at Walmart. Right?

A.    Sure. They're readily available.

R. Doc. 163, T.Tr., Vol. 2 at 234-335.

Mr. Hoeft acknowledges that intent to distribute may be proved by either direct or circumstantial evidence. *United States v. Schubel*, 912 F.2d 952, 956 (8th Cir. 1990). This Court has repeatedly recognized that the evidence necessary to demonstrate that a defendant had the intent to distribute a controlled substance may be established by circumstantial evidence, including such things, as quantity, purity and presence of firearms, cash, packaging material, or other distribution paraphernalia. *United States v. Lopez*, 42 F.3d 463, 467 (8th Cir. 1994) "Moreover, we recognize that intent to distribute may be inferred solely from the possession of large quantities of narcotics. On the other hand, proof of possession of a small amount of a controlled substance, standing alone, is an insufficient basis from which an intent to

distribute may be inferred.

The underlying theme of these cases is whether the defendant possessed a quantity which was more than he would possess for his own use. *United States v. Moore*, 212 F.3d 441, 444 (8th Cir. 2000) (citing *Lopez*, 42 F.3d at 467 (8th Cir. 1994)) (internal quotations and citations omitted); *Schubel*, 912 F.2d at 956 (explaining that the presence of equipment to weigh and measure the narcotics, paraphernalia used to aid in their distribution, large sums of cash, and presence of firearms are common indicia of drug trafficking and are all circumstantial evidence of intent to distribute).

Notably missing from this case was any large sum of cash or records supporting a theory of distribution. Nevertheless, the government argued that the fact that the drugs were found in four separate plastic bags was a significant fact. Yet Agent Purcell conceded that was not necessarily the case here:

> I do believe the stuff in his pocket you could likely deduce that. I believe AUSA Hodges expanded on that too that if you were to be fair, you would deduce the stuff from his pocket as his personal use. It does appear to be the personal use, like what someone might break out, especially a heavy user, like we discussed.

R. Doc. 163, T.Tr., Vol. 2 at 234-335.

Appellate Case: 23-2835    Page: 44    Date Filed: 10/24/2023 Entry ID: 5329061

Agent Purcell further explained:

> The needles and the small amounts in his pocket could be indicative that that's his habit. Those are for him. That's why they're in his pocket. That's what the needles are there. Those are likely his needles. Most people don't want to carry someone else's needle. And the amounts would add up, such as this smaller amount, 3.1 grams of methamphetamine in this bag here.

*Id.* at 311:1.

Although Agent Purcell concluded that the two bags found in Mr. Hoeft's pockets were consistent with personal use, he went on to opine that the other two bags found in Mr. Hoeft's jacket pocket were not. Yet he could not explain the 41-gram bag, "admittedly a unique number. Usually, you're not seeing people buy it like that." *Id.* at 313:16. Aside from the four bags containing the previously specified quantities of methamphetamine, no other packaging materials used to package drugs for distribution were found on Mr. Hoeft's person or in his vehicle.

The government offered no evidence commonly associated contestant with drug trafficking investigations. There were no telephone or other electronic communications records. *Id.* at 324:70. There were no financial records, confidential sources or informants and wiretaps. *Id.* at 325:10. Simply put, there was no extrinsic evidence that suggested that

37

Mr. Hoeft was engaged in any drug trafficking activities.

Due to the lack of any direct evidence that Mr. Hoeft ever sold any methamphetamine to anyone, the government was necessarily compelled to argue that that the circumstantial evidence alone supported a guilty verdict on the issue of intent to distribute. The government's heavy reliance on the quantity of methamphetamine Mr. Hoeft possessed is certainly supported in the case law. *See, e.g., United States v. Schubel,* 912 F.2d 952 (8th Cir. 1990); *United States v. Lopez*, 42 F.3d 463 (8th Cir. 1994). However, the weight of the evidence presented by the government in such cases is typically of a significantly different magnitude than the evidence presented in this case.

In *Schubel*, for example, the defendant challenged the sufficiency of the government's evidence with respect to his conviction for intent to distribute methamphetamine. This Court concluded that the evidence was consistent with possession of contraband with the intent to distribute, affirming the judgment. *Id.* at 956. The decision was based on the following evidence: a plastic container containing 46.6 grams of methamphetamine, a cassette holder containing a plastic bag which contained 2 grams of methamphetamine and 11 individually wrapped

Appellate Case: 23-2835     Page: 46     Date Filed: 10/24/2023 Entry ID: 5329061

plastic bags of white powder, one of which was later analyzed and determined to contain 3.3 grams of methamphetamine; 5.7 grams of white solid material containing methamphetamine was found in the living room; a small gram scale; an electronic digital scale; a Deering scale; a sifting kit; numerous small baggies; numerous gram vials; a programmable scanner; $1,500.00 in cash; numerous firearms and ammunition, including a loaded .38 caliber pistol, a loaded .357 magnum, a loaded 9mm handgun, a .22 caliber pistol, and a semi-automatic 12 gauge shotgun; and a "pipe bomb" and other various explosive devices.

The *Schubel* court did not conclude that there was sufficient evidence to support the defendant's conviction for intent to distribute based solely on the quantity of the methamphetamine, combined with a scale and a .22 caliber pistol. Rather, there was a myriad of evidence, all of which was indicia of drug tracking that was present in addition to the methamphetamine which this Court considered in reaching its decision.

In *United States v. Lopez*, 42 F.3d 463 (8th Cir. 1994), the defendant similarly challenged the sufficiency of the evidence with respect to the possession with intent to distribute four grams of methamphetamine

*Lopez*, 42 F.3d at 467. This Court agreed, holding those four grams of methamphetamine "could not single-handedly support an inference of intent to distribute." *Id*. at 468 (citations omitted). Again, the *Lopez* Court reasoned that because the quantity of methamphetamine alone was insufficient to support a reasonable inference the intent to distribute, it was necessary to look to "additional circumstances or evidence consistent with an intent to distribute narcotics." *Id*. (citation omitted).

In so doing, the *Lopez* court ultimately concluded that the government failed to produce sufficient additional evidence from which a jury could draw a reasonable inference that the defendant intended to distribute the methamphetamine. The court explained that the drug was not packaged for resale, and the government did not introduce evidence of a large amount of unexplained cash or other distribution evidence of distribution. The *Lopez* court further concluded that a reasonable jury could not infer that the presence of an unloaded rifle and shotgun located in the trunk of the car along with camping gear, including duck calls and waders, were "tools" of the drug trade. *Id*.

Mr. Hoeft recognizes that in case such as *Schubel* and others, the

40

Court has sustained the inference of intent to distribute in cases involving quantities comparable to the amount found in his possession at the time of his arrest. However, as *Schubel* demonstrates, the government's proof typically includes substantial additional evidence consistent with the distribution of narcotics. In *Lopez,* it was precisely because of the government's lack of additional evidence consistent with an intent to distribute narcotics that this Court determined that there was insufficient evidence to convict the defendant on the intent to distribute charge.

In this case, although Hoeft possessed significantly more than four grams of methamphetamine, as was the case in *Lopez*, given the quantity necessary to support his addiction daily, any per se threshold would necessarily fail to recognize the distinction between a casual user and the extremes of the addiction.

The government did introduce the .22 caliber handgun, loaded with birdshot, in the holster Mr. Hoeft was wearing when he was pulled from his vehicle. While the presence of a firearm is generally consistent with drug trafficking, *see United States v. Bryson*, 110 F.3d 575, 585 (8th Cir. 1997) (holding that evidence of a loaded firearm next to drug related

41

items is probative of intent to distribute), millions of law-abiding Americans possess firearms as well. The probative value of a .22 caliber handgun loaded with birdshot is also consistent with the presence of other hunting gear, such as the cross bow observed by arresting officers sitting on the front seat of the pickup at the time of Mr. Hoeft's arrest.

In reviewing the sufficiency of the evidence, this Court should conclude that a reasonable factfinder could not have found guilt beyond a reasonable doubt that Mr. Hoeft intended to distribute the methamphetamine found on his person.

**4. The district court erred in denying Mr. Hoeft's motion to admit statements made to a chemical dependency counselor for purposes of a chemical dependency evaluation pursuant to F.R.E. 803(4) and 807(b).**

*Standard of Review*

This Court reviews evidentiary rulings for abuse of discretion and affords deference to the district judge who saw and heard the evidence. *United States v. Hellems*, 866 F.3d 856, 861 (8th Cir. 2017). An evidentiary ruling may be reversed "only when [it] affected the defendant's substantial rights or had more than a slight influence on the verdict." *Id.*

*Argument*

42

Following his arrest on September 24, 2021, and while incarcerated in the Minnehaha jail, on November 1, 2021, Mr. Hoeft completed a chemical dependency evaluation. R. Doc. 92. The evaluator who met with Mr. Hoeft prepared a State of South Dakota Division of Alcohol and Drug Abuse Integrated Initial Assessment, dated November 8, 2021. A copy of that assessment with proposed redactions were submitted to the district court together with a motion seeking a pretrial ruling on the admission of the report and a memorandum in support of that motion pursuant to Federal Rules of Evidence 803(4) and 807(b). R. Docs. 91 and 92 at Ex. 1 and 2.

As part of the chemical dependency evaluation, Mr. Hoeft made disclosures to the evaluator regarding his history of substance abuse and current daily use of methamphetamines which were documented in the assessment. The district court denied Mr. Hoeft's motion to admit the report or allow the testimony of the evaluator, finding that the report was not made for the purposes of obtaining medical treatment under F.R.E. 803(4).

Mr. Hoeft asserts that in denying the motion, the district court's error violated his right to present a complete defense. A defendant in a

43

criminal case has an undeniable right to present a complete defense

under the Fifth and Sixth Amendments to the Constitution:

> "'[T]he Constitution guarantees criminal defendants a
> meaningful opportunity to present a complete defense,'
> which includes the right to present testimony of witnesses
> that is material and favorable to their defense and complies
> with the rules of evidence." *United States v. Holmes*, 413
> F.3d 770, 774 (8th Cir. 2005) (alteration in original) (quoting
> *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90
> L.Ed.2d 636 (1986)). The right to present testimony is
> "grounded in the [F]ifth and [S]ixth [A]mendments." *United
> States v. Turning Bear*, 357 F.3d 730, 733 (8th Cir. 2004).

*United States v. Clay*, 883 F. 3d 1056, 1059 (8th Cir. 2018); *but see,*

*Taylor v. Illinois*, 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798

(1988)(noting that "[t]he accused does not have an unfettered right to

offer testimony that is incompetent, privileged, or otherwise

inadmissible under standard rules of evidence.").

The chemical dependency evaluation was admissible under the

Federal Rule of Evidence. F.R.E. 803(4) admits as an exception to

the hearsay rule:

> Statements made for purposes of medical diagnosis or
> treatment and describing medical history, or past or present
> symptoms, pain, or sensations, or the inception or general
> character of the cause or external source thereof insofar as
> reasonably pertinent to diagnosis or treatment.

44

Fed.R.Evid. 803(4). "Rule 803(4) admits three types of statements: (1) medical history, (2) past or present sensations, and (3) inception or general cause of the disease or injury." Notes of Advisory Committee on Proposed Rules, Exception (4). "All three types are admissible where they are 'reasonably pertinent to diagnosis or treatment.'" *United States v. Iron Shell*, 633 F. 2d 77, 83 (8th Cir 1980). The question under the Rule is whether the statement of the declarant was "reasonably pertinent" to diagnosis or treatment. *United States v. Renville*, 779 F. 2d 430, 436 (8th Cir. 1985).

The exception does not require the statement to have been made to a physician:

> [W]e have consistently upheld the admission of statements made to psychologists or trained social workers, provided that the declarant was seeking treatment, the statements were relevant to diagnosis or treatment, and the statements were not coached. *Compare United States v. Balfany*, 965 F.2d 575, 579-81 (8th Cir. 1992); *United States v. Provost*, 875 F.2d 172, 176-77 (8th Cir.), cert. denied, 493 U.S. 859, 110 S.Ct. 170, 107 L.Ed.2d 127 (1989); and *United States v. Renville*, 779 F.2d 430, 435-39 (8th Cir. 1985); with *United States v. White*, 11 F.3d 1446, 1449-50 (8th Cir. 1993).

*United States v. Yellow*, 18 F. 3d 1438, 1442 (8th Cir 1994).

Given the quantity of methamphetamine seized in this matter relative to Mr. Hoeft's testimony regarding the nature and extent of his

45

daily use of methamphetamine, the district court's denial of the admission of the chemical dependency evaluation was contrary to his rights under the Fifth and Sixth Amendments to present a complete defense. From an evidentiary standpoint, his statements were reasonably pertinent to his pursuit of chemical dependency treatment and fall squarely within the "significantly liberalized" corners of Rule 803(4). *Iron Shell*, 633 F.2d at 83.

At trial Mr. Hoeft argued that the quantity of methamphetamine in his possession was for his own use. He testified that he might use more than seven grams of methamphetamine daily, for five to seven days in a row. Likewise, the chemical dependency evaluator reported Mr. Hoeft using "[a]t least two eight balls" daily (seven grams). R. Doc. 92 at Ex. 1. In other words, the 70.83 total grams of methamphetamine Mr. Hoeft had in his possession would support his habit for approximately 10 days.

As previously noted, the government did not dispute that Mr., Hoeft was a methamphetamine addict. In fact, Agent Purcell attributed the 1.59 grams found in Mr. Hoeft's pants pockets to his personal use. But 1.59 grams of methamphetamine would not support the habit of an 8-

46

ball a day user (3.5 grams), which agent Purcell testified that a heavy user might consume.

The "more than a slight influence on the verdict" that the issue of Mr. Hoeft's daily consumption had upon the jury is evidenced by their written question submitted to the district court during jury deliberations: "May we have a calculator." R. Doc. 122.

As the jury was tasked not only with determining whether Mr. Hoeft was guilty of possessing the methamphetamine with the intent to distribute, but also, whether the quantity of methamphetamine he possessed with the intent to distribute, if any, exceeded 50 grams. Establishing the nature and extent of Mr. Hoeft's use was essential to his defense. By denying the admission of the chemical dependency evaluation or the testimony of the evaluator, Mr. Hoeft was denied the right to present a complete defense.

## Conclusion

Based upon the arguments and authorities presented, Mr. Hoeft respectfully requests that the judgment in this matter be vacated.


Respectfully submitted this 24th day of October, 2023.

BANGS, MCCULLEN, BUTLER,
FOYE & SIMMONS, LLP

/s/ Rick L. Ramstad
Rick L. Ramstad
6340 S. Western Ave., Suite 160
Sioux Falls, SD 57108
T: 605-339-6800
Attorney for Appellant, Michael Hoeft

48

## Certificate of Service

I hereby certify that on the 24th day of October, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

BANGS, MCCULLEN, BUTLER,
FOYE & SIMMONS, LLP

/s/ Rick L. Ramstad
Rick L. Ramstad

## Certificate of Compliance

The undersigned hereby certifies that the forgoing Appellant's Brief was prepared using Microsoft® Word for Mac, version 16.75, Microsoft 365®, using Century Schoolbook, a proportionally spaced roman style 14-point typeface. The application's word count function returned 10,513 words. I further certify the electronic version of the Appellant's Brief and Appellant's Addendum were scanned by use of the operating system macOS Sonoma 14.0 running XProtect and are virus free.

Dated this 24th day of October, 2023.

BANGS, MCCULLEN, BUTLER
FOYE & SIMMONS, LLP

/s/ Rick L. Ramstad
Rick L. Ramstad

Appellate Case: 23-2835    Page: 57    Date Filed: 10/24/2023 Entry ID: 5329061